UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

L.M.,

                   Plaintiff,

        v.

KILOLO KIJAKAZI,

                   Defendant.

Case No.  22-cv-04729-VKD

**ORDER RE CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

Re: Dkt. Nos. 21, 24

This is the second appeal filed by plaintiff L.M.,[1] challenging a final decision of the

Commissioner of Social Security ("Commissioner") denying her application for supplemental

security income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381, *et*

*seq.*  L.M. contends that the administrative law judge ("ALJ") erred in his assessment of the

medical and other source opinions, L.M.'s own statements regarding her limitations, and the issue

of whether L.M. meets or equals the Commissioner's 12.15 listing pertaining to trauma- and

stressor-related disorders.  The Commissioner maintains that the ALJ properly evaluated the

evidence and that substantial evidence supports his finding that L.M. had no more than moderate

limitations in her functional abilities during the relevant period.

        The parties have filed cross-motions for summary judgment.  Dkt. Nos. 21, 24, 25.[2]  The

---

[1] Because orders of the Court are more widely available than other filings, and this order contains
potentially sensitive medical information, this order refers to the plaintiff only by her initials.  This
order does not alter the degree of public access to other filings in this action provided by Rule
5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule 5-1(c)(5)(B)(i).

[2] After the parties submitted their briefing, attorney Christian Yost filed a notice of substitution of
counsel for L.M.  Dkt. No. 26.  Although the Court issued an order directing Mr. Yost to address
the status of his admission to practice before this Court (Dkt. No. 27), the Court's records indicate

United States District Court
Northern District of California

United States District Court
Northern District of California

matter was submitted without oral argument.  Upon consideration of the moving and responding papers and the relevant evidence of record, for the reasons set forth below, the Court grants L.M.'s motion for summary judgment, denies the Commissioner's cross-motion for summary judgment, and remands this case for an immediate calculation and payment of benefits.[3]

## I.      BACKGROUND

L.M. was born in 1973 and has a high school education.  Her past employment includes work as a homecare giver, insulation worker, customer service clerical worker, shuttle bus driver, and delivery route truck driver.  She attended barber college in 2014, but did not complete the examination for licensing.  *See* AR[4] 37, 40, 204, 209, 715, 592, 631.  L.M. also reported working as an "on call" dishwasher at a restaurant, for three to four hours a couple of times per week, in 2019 and 2020.  *See* AR 717-718.

On April 29, 2014, L.M. applied for SSI, alleging disability beginning September 1, 2007 due to "[d]egenerative bone disease, scoliosis, depression, [and] other mental [and] physical issues."  AR 154, 316.  Her application was denied initially and on review.  ALJ David Mazzi held a hearing on October 5, 2016 and subsequently issued an unfavorable decision on September 25, 2017.  AR 14-26, 33-42.

The Appeals Council denied L.M.'s request for review of ALJ Mazzi's decision.  AR 1-3.  L.M. sought judicial review of the decision denying her application for benefits.  AR 771-789.  On May 31, 2020, this Court granted in part and denied in part L.M.'s motion for summary judgment and remanded the matter for further proceedings.  AR 806-830.  The Court found no error in the ALJ's assessment of L.M.'s statements regarding the limiting effects of her symptoms, but concluded that he did not properly evaluate the medical and other source opinions.  *See id*.

On remand, the Appeals Council vacated the Commissioner's final decision and remanded

---

that he has not yet done so.

[3] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge.  28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 7, 8.

[4] "AR" refers to the certified administrative record lodged with the Court.  Dkt. No. 11.

the matter to an ALJ to "offer the claimant the opportunity for a hearing, take any further action needed to complete the administrative record and issue a new decision." AR 833. ALJ Arthur Zeidman[5] held a telephonic hearing on May 12, 2022 at which a vocational expert ("VE") testified. AR 710-742. On June 2, 2022, he issued an unfavorable decision. AR 671-709. He found that L.M. has not engaged in substantial gainful activity since the April 29, 2014 date of her SSI application. AR 677. He further found that L.M. has the following severe impairments: degenerative disc disease, scoliosis, affective disorders, anxiety disorder, post-traumatic stress disorder ("PTSD"), and cocaine use disorder. AR 678. ALJ Zeidman found that L.M. does not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in the Commissioner's regulations. AR 679. He determined that L.M. has the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. § 416.967(c), except that she is limited to "simple routine tasks" and "simple work-related decisions." AR 681. ALJ Zeidman found that transferability of job skills is not material, and concluded that L.M. is not disabled because she is capable of performing jobs that exist in significant numbers in the national economy. AR 696, 697.

After the ALJ's decision became final, *see* 20 C.F.R. § 416.1484, L.M. filed this second action seeking judicial review of the decision denying her application for benefits.

## II.    LEGAL STANDARD

Pursuant to 42 U.S.C. § 405(g), this Court has the authority to review the Commissioner's decision to deny benefits. The Commissioner's decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. *Ahearn v. Saul*, 988 F.3d 1111, 1115 (9th Cir. 2021) (citation omitted); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999) (citation omitted). In this context, the term "substantial evidence" means "more than a mere scintilla" but "less than a preponderance" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ahearn*, 988 F.3d at 1115 (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148,

---

[5] The record indicates that ALJ Mazzi retired. *See* AR 675, 712.

1154 (2019) and *Molina v. Astrue*, 674 F.3d 1104, 1110-11 (9th Cir. 2012), *superseded by regulation on other grounds*); *see also Morgan*, 169 F.3d at 599 (citation omitted).  When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence.  *Ahearn*, 988 F.3d at 1115 (citation omitted); *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989).  Where evidence exists to support more than one rational interpretation, the Court must defer to the decision of the Commissioner.  *Ahearn*, 988 F.3d at 1115-16 (citation omitted); *Morgan*, 169 F.3d at 599 (citation omitted).

## III.   DISCUSSION[6]

### A.   Medical and Other Source Opinions

The primary basis of L.M.'s appeal concerns the ALJ's evaluation of the medical and other source opinions, which informed his other findings.  The opinions at issue[7] concern L.M.'s mental impairments and were rendered by two non-examining physicians (Owen Daniels, M.D., and R. Warren, M.D.), three examining or treating psychologists or psychiatrists (Lisa Kalich, Psy.D., Aislinn Bird, M.D., and Lesleigh Franklin, Ph.D./Dionne Childs, M.S.), and three other sources (Kari Jennings-Parriott, LCSW, Audrey Fisher, RN, and community health worker Dani Burnich-Line).  The ALJ gave "partial weight" to the opinions of the non-examining physicians and "little weight" to the opinions of the remaining medical and other sources.  L.M. argues that the ALJ should not have given any weight to the opinions of Drs. Daniels and Warren, when L.M.'s medical and other sources concluded that L.M.'s functional abilities are more limited.  The

---

[6] The Court finds it unnecessary to separately address L.M.'s omnibus arguments that the ALJ made "bulk citations" to the administrative record.  The Court has considered those arguments in evaluating the specific errors L.M. alleges, and does not find a basis to reverse the ALJ's decision based on alleged "bulk citations."

[7] L.M. does not challenge the ALJ's decision to give "significant weight" to the opinion of consulting examiner Todd Nguyen, DO, who conducted an orthopedic evaluation of L.M. in October 2014.  *See* AR 685.  L.M. does not directly challenge the ALJ's evaluation of the opinions of her treating physician, Kevin Critchlow, M.D. or that of H. Samplay, M.D., a non-examining state agency consultant.  *See* AR 684-685.  However, in the context of addressing the ALJ's evaluation of her own statements regarding her symptoms, L.M. contends that the ALJ erroneously gave more weight to Dr. Samplay's opinion than to that of Dr. Critchlow.  Those arguments regarding Drs. Samplay and Critchlow will be addressed separately below.

United States District Court
Northern District of California

Commissioner maintains that the ALJ properly evaluated these medical and other source opinions and that his findings are supported by substantial evidence. Each opinion is summarized below.

### 1.   Summary of Medical Opinions

#### a.   Lisa Kalich, Psy.D.

Lisa Kalich, Psy.D. conducted a psychological evaluation of L.M. in July 2014. As part of her evaluation, Dr. Kalich conducted a clinical interview of L.M., reviewed L.M.'s records from the Santa Rita Mental Health Services and the West Oakland Health Council, and administered the Wechsler Adult Intelligence Scale-IV ("WAIS-IV") and the Wechsler Memory Scale-III, Abbreviated ("WMS-III-A"). AR 503-509. According to Dr. Kalich's report, the evaluation originally was scheduled for June 2014, but L.M. failed to appear for her appointment. AR 506. Additionally, Dr. Kalich observed that L.M. was fifteen minutes late for the July 2014 evaluation, noting that L.M. said that "she often has difficulty organizing and motivating herself to leave the home." *Id*. Dr. Kalich observed that L.M. was adequately groomed, casually dressed, had good eye contact, spoke at an even pace, was easily understood, and was cooperative, though "guarded at times." *Id*. Dr. Kalich noted L.M.'s depressed mood and relatively flat affect, and stated that L.M. was tearful and cried intermittently throughout the evaluation. *Id*.

During the clinical interview, L.M. reported a history of child abuse, strained family relationships and domestic violence, and abusive intimate partner relationships, including incidents of being fondled by an adolescent boy when she was six years old; being "stomped" on her hip by a boyfriend in 2006; and being stabbed in the head by a boyfriend's ex-girlfriend. According to L.M., the abuse during a two-year relationship with one boyfriend was so severe, that she attempted suicide several times. Although her boyfriend ended that relationship, L.M. reported that she continued to fear him. AR 503-504. L.M. also reported a history of substance abuse, including an ongoing struggle with cocaine use. AR 505.

The WAIS-IV test results revealed that L.M.'s "Full Scale IQ is 92, which falls in the average range of functioning." AR 506. L.M.'s performance on the WMS-III-A "place[d] her in the borderline range of functioning," and Dr. Kalich remarked that L.M.'s "memory abilities are far below what would be expected given her general level of intelligence." AR 507.

Dr. Kalich stated her diagnostic impression that L.M.'s functioning is characterized by PTSD; severe cocaine use disorder, early partial remission; unspecified neurocognitive disorder; and borderline personality traits, with a need to rule out other specified depressive disorder and cocaine induced depressive disorder. *Id.* Dr. Kalich noted that L.M.'s "diagnostic presentation is complicated by her dependence on cocaine," stating that "[c]hronic addiction has likely exacerbated [L.M.]'s mood symptoms," and that while she demonstrates some symptoms consistent with a depressive disorder (e.g., feelings of sadness, low energy, appetite disturbance, and loss of pleasure), those symptoms may also be attributed to cocaine withdrawal. AR 508. L.M. reported that she had last used cocaine one month prior to Dr. Kalich's evaluation. AR 505. Dr. Kalich noted that if L.M. "establish[es] a longer period of sobriety, her diagnostic picture would become clearer." AR 508.

Dr. Kalich assessed moderate to severe impairments in L.M.'s activities of daily living, noting that while L.M. has an impaired memory and reports "difficulty keeping track of appointments and other important events . . . it is [L.M.]'s depressed mood and PTSD that are most impactful with regard to her ability to complete tasks of daily living." AR 508. Dr. Kalich further opined that "[d]ue to her depressed mood, [L.M.] would have difficulty maintaining regular attendance at work." *Id.*

Dr. Kalich assessed moderate impairment of L.M.'s ability to engage in social interactions, noting that L.M.'s depression and anxiety cause her to withdraw from others, while PTSD symptoms "cause her to be hypervigilant and suspicious of others, particularly men." AR 509. According to Dr. Kalich, "[t]hese symptoms would likely impair [L.M.]'s ability to form and maintain positive work relationships." *Id.* While L.M. reported no difficulty in "managing her work relationships historically," Dr. Kalich opined that L.M.'s "symptoms may cause instability in her interactions with colleagues and the public." *Id.*

With respect to L.M.'s concentration, persistence, and pace, Dr. Kalich found no significant impairments in concentration and attention during the evaluation itself. However, Dr. Kalich opined that L.M.'s "descriptions of frequent flashbacks and hypervigilance suggest that [she] likely struggles with intermittently severe deficits in concentration and attention." *Id.* Dr.

1   Kalich further opined that if L.M.'s PTSD symptoms were "triggered in a work setting, [she]

2   would be unable to focus on a task." *Id*.  According to Dr. Kalich, L.M.'s memory deficits

3   "further reflect her difficulties in concentration" and that "[d]ue to her low energy and fatigue,

4   [L.M.]'s pace and persistence may be mildly impaired." *Id*.

5        With respect to episodes of decompensation, Dr. Kalich noted that L.M.'s "descriptions of

6   her functioning suggest numerous, past episodes of decompensation which were marked by

7   suicide attempts." *Id*.  Dr. Kalich opined that L.M. "is vulnerable to experiencing future episodes

8   of decompensation," and that her anxiety symptoms would "likely . . . require ongoing treatment."

9   *Id*.  However, "[e]ven with the necessary treatment," Dr. Kalich stated that L.M.'s "prognosis is

10  guarded." *Id*.  Dr. Kalich further opined that if L.M. "continues to manage her anxiety through

11  avoidance, which only reinforces her PTSD symptoms, it is unlikely that her mental functioning

12  will improve." *Id*.  Additionally, Dr. Kalich noted "situational factors, including [L.M.'s]

13  problematic personality features and ongoing struggle to maintain her sobriety, which make it

14  likely that she will continue to struggle with mood and anxiety symptoms." *Id*.

15       The ALJ gave Dr. Kalich's opinion "little weight," explaining that "[t]he opinion was

16  proffered early in the adjudicatory period and as a result, Dr. Kalich did not have the opportunity

17  to review the subsequent medical record," which the ALJ found to be inconsistent with Dr.

18  Kalich's assessment.  AR 691.  The ALJ further stated that "portions of the opinion are stated in

19  equivocal, vague, and vocationally imprecise terms (i.e., 'moderate,' 'may,' 'likely') and therefore

20  add limited probative value towards determination of the claimant's specific work-related

21  limitations." *Id*.  The ALJ also found that Dr. Kalich's "opinion is also, in some respects,

22  internally inconsistent and lacks support." *Id*.

23            **b.    Dr. Lesleigh Franklin, Ph.D. and Dionne Childs, M.S.**

24       In May 2017, psychologist Lesleigh Franklin, Ph.D. supervised an examination of L.M.,

25  conducted by Dionne Childs, M.S., to determine L.M.'s cognitive functioning and the severity of

26  her mental health symptoms.  AR 631-637.  The examination was based on a clinical interview of

27  L.M., a review of her medical records from the Alameda County Behavioral Health Care Services,

28  Horizon Services, Inc., LifeLong Medical Care, and the Santa Rita jail, as well as Dr. Kalich's

United States District Court
Northern District of California

July 2014 evaluation, and L.M.'s performance on tests including the Miller Forensic Assessment of Symptoms (M-FAST), Mini Mental State Examination ("MMSE"), Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS")—Form A, and Trail Making A & B. AR 631.

In a report of that examination, co-authored with Ms. Childs, Dr. Franklin noted that L.M. was "only partially oriented to person, place and time" and that her "[a]ttention was somewhat problematic on formal measures." AR 632. Her eye contact was minimal. AR 634. She presented with a euthymic mood and flat affect. *Id*. She "had a respectful disposition, engaged with the interviewer, and was open in conveying her perception and sharing her experiences." *Id*. At that time, L.M. was living in transitional housing and noted a history of homelessness. AR 632. She reported a history of physical and sexual abuse, including being molested as a child and raped in 2012, as well as a history of substance use problems, and endorsed symptoms related to PTSD, as well as depressed mood, suicidality, memory problems, and disorientation. AR 632, 635. Other reported areas of concern included "difficulty remembering and following instructions, low frustration tolerance, and trouble consistently complying with strict workplace expectations." *Id*. The report also noted that L.M. was "dealing with financial stress as she has had difficulty maintain and obtaining employment," "has significant medical problems, a pattern of perceptual distortions and poor coping skills, which appear to have influenced the severity of her mental health concerns," as well as "neuropsychological impairments that might be roadblocks to her ability to maintain employment." *Id*.

Dr. Franklin and Ms. Childs reported that L.M.'s M-FAST score "suggests that she was not prone to overstate the severity of her symptoms." AR 633. They further noted that "Global Assessment of Functioning would describe [L.M.] as having impairment in social and occupational functioning." AR 635. L.M.'s overall RBANS score placed her in the "Extremely Low" range of functioning and indicated "notable problems with language, visuospatial abilities, immediate memory, delayed memory, and executive functioning," though L.M.'s "composite attention and concentration scores were within average range." AR 633. L.M.'s overall score on the MMSE showed mild impairment. AR 633, 637. The report noted that the MMSE is used "to

8

describe an individual's current mental status" and "screen[s] for patients with more severe neuropsychological illnesses as a result of brain disease or physical trauma," although "[p]atients with serious mental illness may not always present with impairments on this exam."  AR 634.

Dr. Franklin and Ms. Childs found that L.M. meets the criteria for major depressive disorder, PTSD, major neurocognitive disorder, and other substance use disorder, and also suffers from a number of psychosocial stressors.  They recommended that L.M.'s "[s]ymptoms of mania/hypomania should also be monitored as Santa Rita records suggest bipolar disorder without criteria that was met to fall within that diagnostic category."  AR 636.  They further recommended that L.M. "maintain and increase regular psychotherapy session attendance and maintain psychiatric medication evaluation compliance" to manage her symptoms.  *Id.*

With respect to L.M.'s mental abilities and aptitudes needed to perform unskilled work, Dr. Franklin and Ms. Childs assessed moderate to extreme limitations in all areas.  The report notes moderate limitations in the abilities to understand, remember and carry out very short and simple instructions; get along and work with others; interact appropriately with the general public; and accept instructions and respond appropriately to criticism from supervisors.  AR 637.  The report indicates marked limitations in L.M.'s abilities to maintain attention and concentration for two-hour segments; perform at a consistent pace without an unreasonable number and length of rest periods; and maintain regular attendance and be punctual within customary, usually strict tolerances.  *Id.*  The report notes extreme limitations in L.M.'s abilities to understand, remember and carry out detailed instructions; respond appropriately to changes in a routine work setting and deal with normal work stressors; and complete a normal workday and workweek without interruptions from psychologically based symptoms.  *Id.*

The ALJ gave this opinion "little weight," stating that "the objective medical evidence and treatment history is inconsistent with the medical opinion" and "[t]he opinion is also internally inconsistent[.]"  AR 692.  He also found the assessed "extreme" limitations to be inconsistent with L.M.'s work as a dishwasher in 2019 and 2020.  *Id.*

### c.    Dr. Aislinn Bird, M.D.

Dr. Bird is a treating psychiatrist at the LifeLong Trust Health Center in Oakland,

United States District Court
Northern District of California

California who evaluated L.M. on one occasion in April 2017 "for medication consultation and diagnosis clarification." AR 614-618. Dr. Bird noted L.M.'s reported history of sexual and physical abuse and of daily auditory hallucinations. Dr. Bird stated that L.M. "[e]ndorses nightmares 2-3x/week, flashbacks several times per week, does not feel comfortable in crowds and is easily startled. Endorses [auditory hallucination] of her [boyfriend]'s voice with negative content about herself." AR 615, 616. While L.M. also expressed current passive suicidal ideation, Dr. Bird noted that L.M. "[h]as hope for the future," and that her "[s]on and emotional support dog are strong protective factors." *Id*. Dr. Bird observed that L.M. presented with a "[d]epressed [a]nxious" mood, slumped posture, intermittent eye contact, and mildly impaired ability to make reasonable decisions, but otherwise exhibited normal activity, perception, thought content, cognition, and insight, clear speech, average intelligence, and logical thought process. AR 616-617. Dr. Bird found that L.M. "meets criteria for PTSD (nightmares, flashbacks, hypervigilance, avoidance behavior, difficulty being in crowds)" and remarked that her auditory hallucinations are "due to severe and chronic PTSD, not [due to] a primary psychotic disorder, thus antipsychotic medication is not indicated." AR 617. Dr. Bird assessed PTSD; major depressive disorder, recurrent, moderate; and cocaine use, unspecified, uncomplicated. *Id*. She noted that "[s]evere PTSD is a strong contributing factor in [L.M.]'s crack cocaine use disorder, as it's a means of numbing and avoiding symptoms." *Id*. She stated that L.M. "is notable for her insight (connecting childhood abuse with ongoing [intimate partner violence]), academic skills (reading and referencing a book by Bell Hooks) and her willingness to ask for help and wanting to change (especially in regards to safely leaving her [boyfriend])." *Id*. However, Dr. Bird opined that "[g]iven [L.M.]'s severe and chronic psychiatric conditions that interfere with her ability to concentrate, motivate or handle stress, she is not expected to be able to maintain gainful employment." *Id*.

In June 2017, Dr. Bird co-signed a mental impairment questionnaire with Kari Jennings-Parriott, LCSW, a licensed social worker who provided L.M. with psychotherapy.[8] AR 625-629.

---

[8] Ms. Jennings-Parriott's separate statement is discussed below.

United States District Court
Northern District of California

1   The questionnaire notes that L.M. first began receiving treatment in June 2016, and that her

2   frequency of contact was "sporadic—sometimes bimonthly/monthly." AR 625. L.M.'s diagnoses

3   included major depressive disorder, recurrent; PTSD; and cocaine use, unspecified,

4   uncomplicated. *Id*. The questionnaire states that "[L.M.] is cooperative but poorly engaged due to

5   crisis, retraumatization and multiple psychosocial stressors. She regularly presents in crisis." *Id*.

6   The questionnaire further notes that "PTSD and depression can magnify pain and reduce coping

7   skills." *Id*. L.M.'s listed symptoms include "[d]elusions or hallucinations," "[g]rossly

8   disorganized behavior/catatonia," "[d]iminished interest in almost all activities," "[s]leep

9   disturbance," "[d]ecreased energy," "[d]ifficulty concentrating or thinking," "[e]asy or frequent

10   distractability," "[i]nvolvement in activities that have a high probability of painful consequence

11   which are not recognized," "[e]asily fatigued," "[p]anic attacks followed by a persistent concern or

12   worry about additional panic attacks or their consequences," "[i]nvoluntary, time consuming

13   preoccupation with intrusive, unwanted thoughts," "[d]etachment from social relationships,"

14   "[d]ifficulty organizing tasks," "[a]voidance of external reminders of the event," "[i]ncrease in

15   arousal and reactivity," "[d]isorganized thinking," "[d]epressed mood,""[f]eelings of guilt or

16   worthlessness," "[i]rritability," "[d]istrust or suspiciousness of others," "[d]ifficulty sustaining

17   attention," "[e]xposure to actual or threatened death, serious injury, or violence," "[i]nvoluntary

18   re-experiencing of a traumatic event," and "[d]isturbance in mood and behavior." AR 626. The

19   questionnaire notes various mild, moderate, marked, and extreme limitations in several areas of

20   mental functioning, and assesses L.M. with overall marked limitations in concentration,

21   persistence and pace and in her ability to understand, remember and apply information, as well as

22   overall extreme limitations in her ability to interact with others and in her ability to adapt or

23   manage herself. AR 627-628. Dr. Bird and Ms. Jennings-Parriott opined that L.M.'s impairments

24   were not expected to significantly improve even in the absence of substance abuse. AR 628. On

25   average, L.M. would be expected to miss four or more days of work per month due to her

26   impairments or need for treatment, and would be off-task more than 30% of an eight-hour

27   workday. *Id*. The report further notes that the severity of L.M.'s symptoms make it difficult for

28   her to "engage, follow through and maintain contact with her treatment team" and to organize

herself and maintain scheduled appointments.  AR 628-629.

The ALJ gave the June 2017 functional statement "little weight" because he found the assessment to be inconsistent with the record.  AR 693.  He also found the June 2017 statement to be inconsistent with negative objective signs in Dr. Bird's and Ms. Jennings-Parriott's own records.  *Id.*  As with Dr. Kalich's opinion, the ALJ stated that the June 2017 statement "was provided generally early in the adjudicative period," and he therefore found the opinion to be inconsistent with "recent treatment records (generally from 2018, forward) [that] do not at all establish consistent objective signs to corroborate the 2016 opinion." [9]  AR 693-694.

### d.    Owen Daniels, M.D. and R. Warren, M.D.

As noted above, Drs. Daniels and Warren are non-examining state agency consultants who reviewed L.M.'s records in September 2014 and March 2015, respectively.  As part of their evaluations, both doctors reviewed Dr. Kalich's report of her July 2014 psychological examination.  None of the other medical source or other source opinions were available at the time that Drs. Daniels and Warren reviewed L.M.'s records.

In September 2014, on the initial review of L.M.'s claim, Dr. Daniels found that L.M. has mild limitations in her activities of daily living and in her ability to maintain concentration, persistence, or pace.  He further found that L.M. has limitations in understanding and memory and in social functioning, including moderate limitations in her abilities to understand and remember detailed instructions, interact appropriately with the general public, and accept instructions and respond appropriately to criticism from supervisors.  But he found that L.M. is otherwise not significantly limited in other areas of mental functioning.  AR 54, 57-58.  Dr. Daniels concluded that L.M.'s mental limitations allow her to perform "basic tasks requiring minimal interaction." AR 58.

In March 2015, on reconsideration of L.M.'s claim, Dr. Warren affirmed findings that L.M. has mild limitations in her activities of daily living and in her ability to maintain

---

[9] The context of this portion of the ALJ's decision indicates that he was addressing the June 2017 functional statement.  His reference to a "2016 opinion" therefore appears to be an error.  Indeed, none of the opinions at issue were proffered in 2016.

United States District Court
Northern District of California

concentration persistence or pace; has moderate limitations in her abilities to understand and remember detailed instructions, interact appropriately with the general public, and accept instructions and respond appropriately to criticism from supervisors; and otherwise has no significant limits in other areas of mental functioning. AR 71, 74-75. Dr. Warren concluded that L.M. has the ability to "understand and remember simple and detailed instructions"; "attend and concentrate for periods of two hours as is required in the workplace"; "interact appropriately with peers and supervisors"; and "adapt to normal workplace changes." AR 75.

The ALJ gave both opinions "partial weight." AR 689, 690. He found Dr. Daniels's assessment limiting L.M. to "minimal interaction" to be "vague, ambiguous, and stated in vocationally imprecise terms and therefore [of] limited probative value." AR 690. However, he credited Dr. Daniels's conclusion that L.M. is restricted to "basic tasks" as "generally consistent with [L.M.]'s symptomology, use of cocaine, and some signs of mood disturbances, diminished memory, and abnormal concentration at times[.]" *Id*. The ALJ disagreed with Dr. Daniels's and Dr. Warren's assessment that L.M. has moderate limitations in her social functioning, finding that the record is inconsistent with such limitations. *Id*. He also disagreed with Dr. Warren's assessment that L.M. is able to understand and remember "simple and detailed instructions," and assessed greater restrictions in that category of mental functioning by finding that L.M. is limited to "simple and routine tasks with only simple decision-making required." AR 690-691.

### 2. Summary of Other Source Opinions

#### a. Kari Jennings-Parriott, LCSW

Ms. Jennings-Parriott is a licensed clinical social worker at the LifeLong Trust Health Center who met with L.M. for psychotherapy in August 2016. In June 2017, Ms. Jennings-Parriott wrote a letter noting L.M.'s diagnoses of PTSD and major depressive disorder, recurrent,[10] severe. AR 670. She opined that "due to [L.M.]'s extensive trauma history and depressive symptoms[,] she has difficulty being in the presence of others, in particular male

---

[10] Ms. Jennings-Parriott's letter states that L.M.'s depressive disorder is "current," which the Court assumes may be a typographical error for "recurrent," consistent with the diagnosis given in the June 2017 functional statement she co-signed with Dr. Bird. *See* AR 625.

United States District Court
Northern District of California

providers/authority figures, and in unfamiliar environments." *Id*.  She stated that L.M. "is hypervigilant and fearful of all new people/places" and "continues to struggle with attending both medical and behavioral health appointments due to her psychiatric symptoms, which recurrently give rise to avoidance, re-experiencing numbness (i.e., freezing up and shutting down), and panic attacks." *Id*.  Noting L.M.'s "fragile state" and that she "decompensates under stress," Ms. Jennings-Parriott further opined that L.M. "has great difficulties participating in social situations due to her trauma history, which interferes with accurate reasoning and sound judgment." *Id*.

The ALJ gave Ms. Jennings-Parriott's opinions "little weight," explaining that her assessment "of problems with reason and judgment is directly contradicted by Ms. Jennings-Parriott's own treatment records" and "[t]he assessed social interaction limitations are inconsistent with other relevant negative objective signs documented throughout the record." AR 694.

### b.      Audrey Fisher, RN and Dani Burnich-Line

Ms. Fisher is a registered nurse and Ms. Burnich-Line is identified as a "community health worker" (AR 1061), both of whom work at LifeLong Medical Care.  On May 11, 2022, they submitted identical letters[11] noting that they had been providing care for L.M. since January 4, 2021.  AR 1469, 1471.  They stated that L.M.'s "care has been impeded by inattention, poor focus, memory impairments, inability to be in close quarters with others, anger, and sleep disturbances resulting in abnormal sleep patterns effecting [sic] ability to maintain consistent schedule." AR 1469, 1471.  Based on their interactions with L.M., Ms. Fisher and Ms. Burnich-Line stated that "it is apparent that she has difficulty concentrating for greater than 5 minutes due to a combination of PTSD symptoms including hypervigilance/distraction by her surroundings, poor focus, and memory impairments." AR 1469, 1471.  They note that L.M. "has been unable to consistently make appointments even with repeated reminders due to these symptoms despite her strong desire to enter and receive care." AR 1469, 1471.  Ms. Fisher and Ms. Burnich-Line state that although they worked to get L.M. into a medical respite program to address physical therapy for incontinence issues, L.M. was unable to complete the intake procedure at the program due to

---

[11] The record contains two identical letters:  one signed by Ms. Fisher (AR 1469) and one signed by both Ms. Fisher and Ms. Burnich-Line (AR 1471).

United States District Court
Northern District of California

the aforementioned mental health symptoms, "as well as difficulty interacting with others, staying in a shared space with other people, following rules and program requirements, and temper resulting from her diagnosed PTSD." AR 1469, 1471. Their letter concludes that "[t]hese difficulties arising from her mental conditions would impede her ability to succeed in a work environment even with reasonable accommodations attempting to be made." AR 1469, 1471.

The ALJ gave these opinions "little weight," stating that they have "no support in the form of objective medical evidence" and are inconsistent with Ms. Fisher's and Ms. Burnich-Line's treatment records, as well as other contemporaneous medical evidence. AR 694.

### 3.   Legal Standard

The Commissioner's rules and regulations regarding the evaluation of medical evidence were revised in March 2017 and apply to claims filed on or after March 27, 2017. *See* 20 C.F.R. § 416.920c. For claims filed before March 27, 2017, the rules in 20 C.F.R. § 416.927 apply. *Id.* Because L.M.'s claims were filed before March 27, 2017, the Court applies the rules then in effect under 20 C.F.R. § 416.927.

For claims filed before March 27, 2017, each of the three types of medical opinions— treating, examining, and non-examining—is accorded different weight based on a "three-tiered hierarchy." *See* 20 C.F.R. § 416.927; *see also Woods v. Kijakazi*, 32 F.4th 785, 789-90 (9th Cir. 2022) (describing weighted analysis under "three-tiered hierarchy" that applies to pre-March 27, 2017 applications). In the top tier are treating physicians, whose opinions are generally given more weight than the opinions of those who do not treat the clamant. *See Woods*, 32 F.4th at 789. A treating physician's opinion is entitled to "controlling weight" if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 416.927(c)(2). In the middle tier are physicians who examine, but do not have an ongoing relationship with, the claimant. *Woods*, 32 F.4th at 789. "To reject either a treating or an examining physician's opinion, an ALJ must provide 'clear and convincing reasons,' if the opinion is uncontradicted by other evidence, or 'specific and legitimate reasons' otherwise, and the reasons must be supported by substantial evidence." *Id.* (quoting *Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017)). "The lowest-

weighted tier comprises physicians who only review the record." *Id.* (internal quotations and citation omitted).  A non-examining physician's opinion is not, by itself, substantial evidence that justifies the rejection of the opinion of either an examining or treating physician. *Id.*  However, the Ninth Circuit has declined "to hold that a nonexamining medical advisor's statements inevitably deserve 'little' or no weight." *Andrews v. Shalala*, 53 F.3d 1035, 1042 (9th Cir. 1995); *see id.* ("[W]hen it is an examining physician's opinion that the ALJ has rejected in reliance on the testimony of a nonexamining advisor, reports of the nonexamining advisor need not be discounted and may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it.").  Moreover, "'[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.'" *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (quoting *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002)).  The ALJ must consider all medical opinions in accordance with several factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the opinion's supportability and consistency, and the physician's specialization, if any.  *See* 20 C.F.R. § 416.927(c)(2)-(6); *Revels*, 874 F.3d at 655.

Only "acceptable medical sources" can be considered treating sources, whose opinions may be entitled to controlling weight.  *See* 20 C.F.R. § 416.927(a).[12]  Under the regulations that apply to this case, "other sources" that are not considered "acceptable medical sources" include nurse-practitioners and licensed clinical social workers.  *See id*. § 416.913(d) & (d)(1) (eff. Sept. 3, 2013 to March 26, 2017) (noting that "[o]ther sources include, but are not limited to . . . [m]edical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists)"); *see also* Social Security Ruling ("SSR") 06-03p, Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims, 2006 WL

---

[12] For claims filed after March 27, 2017, the Social Security Administration no longer distinguishes between an "acceptable medical source" and an "other medical source."  20 C.F.R. § 416.920c.

2329939, at *2 (2006) (explicitly noting that "licensed clinical social workers" constitute "[m]edical sources who are not 'acceptable medical sources'").[13]  Nevertheless, "an ALJ must consider the opinions of medical providers who are not within the definition of 'acceptable medical sources;'" and "may give less deference to 'other sources' only if the ALJ gives reasons germane to each witness for doing so." *Revels*, 874 F.3d at 655 (citing *Molina*, 674 F.3d at 1111); *see also* 20 C.F.R. § 416.927(b); SSR 06-03p, 2006 WL 2329939, at *3.  "The same factors used to evaluate the opinions of medical providers who are acceptable medical sources are used to evaluate the opinions of those who are not." *Revels*, 874 F.3d at 655.  "Those factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the doctor." *Id.*

There appears to be no dispute that the opinions of the non-examining state agency consultants Drs. Daniels and Warren contradict those sources who treated or examined L.M. and who concluded that her functional abilities are more limited.  Thus, the ALJ is required to provide specific and legitimate reasons for giving less weight to the opinions of L.M.'s treating or examining acceptable medical sources.  *Woods*, 32 F.4th at 789; *Andrews*, 53 F.3d at 1041; *see also Perez v. Saul*, 855 F. App'x 365, 366 (9th Cir. 2021) (ALJ required to provide specific and legitimate reasons, supported by substantial evidence, where treating and examining sources' opinions were contradicted by opinion of a non-examining source).[14]  Additionally, he must provide germane reasons for rejecting or discounting the opinions of other sources.  *Revels*, 874

---

[13] Social Security Rulings are binding on all Social Security Administration decisionmakers.  *See Heckler v. Edwards*, 465 U.S. 870, 873 n. 3 (1984); *Bray*, 554 F.3d at 1224 (holding that Social Security Rulings "do not carry the 'force of law,' but they are binding on ALJs nonetheless").  SSR 06-03 was rescinded following the 2017 revisions that eliminated the distinction between an "acceptable medical source" and an "other medical source," but the ruling applies here since L.M.'s claim was filed before March 27, 2017.  *See* Soc. Sec. Rul. 06-03p, rescinded (82 Fed. Reg. 15263-01) but applicable to claims filed before March 27, 2017 (noting "rescission will be effective for claims filed on or after March 27, 2017").

[14] L.M. has not sufficiently briefed her alternative argument that the "clear and convincing" standard applies.  *See Andrews*, 53 F.3d at 1041-42.  In any event, for the reasons discussed below, the Court finds that the ALJ's asserted reasons for rejecting or discounting the opinions of L.M.'s treating and examining sources do not satisfy the "specific and legitimate" standard.

United States District Court
Northern District of California

F.3d at 655.  In either case, the ALJ's reasons must be supported by substantial evidence.

The ALJ essentially discounted the treating or examining medical and other source opinions because he found that that they are (1) inconsistent with the objective medical evidence, (2) internally inconsistent with the source's own observations or findings, and/or (3) inconsistent with other evidence of L.M.'s mental functioning.  While these can be legitimate or germane reasons to discredit opinions, for the reasons discussed below, they are not supported by substantial evidence.

### 4.   Analysis of Medical Opinions[15]

#### a.   Objective Medical Evidence

The ALJ discounted the weight given to the opinions of the treating and examining sources Dr. Kalich, Dr. Bird/Ms. Jennings-Parriott, and Dr. Franklin/Ms. Childs, stating that their opinions are inconsistent with objective medical evidence in the longitudinal record spanning about eight years.  *See* AR 691-693.  For example, noting that Dr. Kalich's "opinion was proffered early in the adjudicatory period," the ALJ stated that "recent records are generally void of any consistent positive objective signs indicative of significant functional limitations" and that records postdating Dr. Kalich's opinion "do[] not show psychiatric emergencies, extended inpatient hospitalizations, or examples of significant decomposition."  AR 691.  In particular, the ALJ found Dr. Kalich's assessment that L.M. has moderate social interaction limitations to be inconsistent with subsequent records showing generally unremarkable mental status examinations.  *See id.* (citing AR 511, 517, 535, 573, 577, 583, 588, 593, 605, 1089, 1154, 1262, 1332-1333, 1458, 1481).[16]  Similarly, with respect to the May 2017 report by Dr. Franklin/Ms. Childs, the

---

[15] The Commissioner argues that a time lapse between the non-examining state agency consultants' opinions and subsequent evidence entered the record does not preclude the ALJ from relying on those consultants' opinions.  *See* Dkt. No. 24 at 7 & n.4.  As the Commissioner acknowledges, however, the key question is whether substantial evidence supports the ALJ's decision to give more weight to the non-examining consultants' opinions than to the opinions of the medical sources who treated or examined L.M.  *Id.* at 7.  For the reasons discussed below, the ALJ's decision is not supported by substantial evidence.

[16] The Court assumes the ALJ's citations to Exhibits 7F/2 and 12F/5 are typographical errors.  Exhibit 7F/2 corresponds to AR 512 and contains no mental status information.  The only mental status information in the entire cited report is a brief notation that during Dr. Nguyen's orthopedic examination, L.M. was observed to be "in no acute distress," with "neutral" mood and

United States District Court
Northern District of California

ALJ stated that "despite psychological impairments, cocaine abuse, and reported symptoms, the record does not show psychiatric emergencies, objective signs of psychosis, involuntary psychiatric holds, extended hospitalizations, or even consistent positive objective signs to corroborate the assessed 'marked' and 'extreme' functional limitations."  AR 692.  Here, the ALJ cited to virtually the same records showing generally unremarkable mental status examinations.  *See id.* (citing AR 511, 517, 535, 573, 577, 583, 588, 593, 605, 1089, 1122, 1154, 1262, 1332-1333, 1458, 1481).[17]  Citing to those same medical records, the ALJ also discounted Dr. Bird/Ms. Jennings-Parriott's June 2017 opinion, stating that "[m]ental status examinations throughout the adjudicatory period include [a] number of negative objective signs (summarized repeatedly above)."  AR 693 (citing AR 511, 517, 535, 573, 577, 583, 588, 593, 605, 1089, 1122, 1154, 1262, 1332-1333, 1458, 1481).  According to the ALJ, "[t]his evidence affirmatively shows intact abilities in a number of vocationally relevant areas such as memory, cognition, interpersonal behavior, communicative behavior, adaption, and concentration."  *Id.*

Substantial evidence does not demonstrate an inconsistency between the opinions of Dr. Kalich, Dr. Franklin/Ms. Childs, and Dr. Bird/Ms. Jennings-Parriott and the objective medical evidence.  While there "is a presumption that ALJs are, at some level, capable of independently reviewing and forming conclusions about medical evidence to discharge their statutory duty to determine whether a claimant is disabled and cannot work," *Farlow v. Kijakazi*, 53 F.4th 485, 488 (9th Cir. 2022), the evaluation of medical opinions must be based on a "holistic view of the record," *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014).  The longitudinal record indeed reflects a number of generally unremarkable mental status examinations showing that L.M. was, for example, calm; cooperative; in no acute distress; alert and oriented to time, person, place and/or situation; had normal thoughts, speech, and insight; and had mildly impaired judgment.

"appropriate" affect.  *See* AR 511.  Exhibit 12F/5 corresponds to AR 606 and is the last page of an April 2017 report that contains no mental status information.  The only mental status information in the entire report is a brief notation that during a physical exam, L.M. was observed to be generally "NAD" (no acute distress).  *See* AR 605.

[17] The cited records include one additional page (AR 1122) that the ALJ did not cite with respect to Dr. Kalich's opinion.

However, most of the records cited by the ALJ concern medical visits during which L.M.'s mental status was observed and recorded in brief notations, but was not being tested, and was unrelated to the issue for which L.M. was being seen and examined, including for orthopedic, gynecological, dental, and other issues such as a cut hand. *See* AR 511, 517, 535, 573, 577, 583, 588, 605, 1089, 1154, 1262, 1332-1333, 1458, 1481. Such records do not constitute substantial evidence discrediting the opinions of L.M.'s examining and treating providers, who treated and evaluated L.M. specifically for mental health issues. *See, e.g., L.L. v. Kijakazi*, No. 20-cv-07438-JCS, 2022 WL 2833972, at *12 (N.D. Cal. July 20, 2022) (ALJ erred in relying on "'cherry-picked observations regarding [claimant]'s presentation that were unrelated to the issue for which [claimant] was being seen and examined); *T.N. v. Kijakazi*, No. 20-cv-04946-TSH, 2021 WL 4553581, at *9 (N.D. Cal. Oct. 5, 2021) (generally normal mental status findings are insufficient to show that physician's opinions were inconsistent with the record, where physician's findings are based on psychological testing and "the 'normal' memory and mood and affect findings cited by the ALJ came from unelaborated mental status examinations at general check-ups or hospital visits for unrelated issues.").

While the psychiatric records cited by the ALJ note some similarly normal mental status findings, those records also document that L.M. continued to experience severe symptoms, namely from ongoing recurrent major depressive disorder and PTSD. For example, the cited 2016 psychotherapy progress report by Ms. Jennings-Parriott assesses PTSD and a moderate episode of recurrent major depressive disorder, and notes that while L.M. had a generally normal appearance, perception, insight and cognition, she was tearful and presented with a slumped posture, avoidant eye contact, slowed activity, depressed mood, anxious attitude, and a flat affect. AR 592-593. Similarly, the cited March 2022 behavioral health assessment shows some unremarkable mental status findings and notes L.M.'s comment that she found a Zoloft prescription helpful. *See* AR 1122. But the report otherwise notes L.M.'s "depressed, nervous and anxious" mood and a PHQ-9 score indicating severe depression, and assesses PTSD and a moderate episode of recurrent major depressive disorder. AR 1122-1123. As the Commissioner seems to acknowledge, similarly abnormal findings are reflected in other examinations throughout the record, including

United States District Court
Northern District of California

United States District Court
Northern District of California

1   those conducted by Drs. Kalich, Franklin, and Bird.  *See* Dkt. No. 24 at 9 (citing AR 505-507,

2   560, 561, 565, 592-593, 611, 616-617, 632-634).

3       The ALJ also discounted the opinions of Dr. Kalich, Dr. Franklin/Ms. Childs, and Dr.

4   Bird/Ms. Jennings-Parriott based on a lack of evidence of psychiatric emergencies, involuntary

5   psychiatric holds, extended hospitalizations, or episodes of decompensation.  *See* AR 691, 692,

6   693.  However, it is unclear why the ALJ found the lack of such evidence to be inconsistent with

7   their respective assessments of L.M.'s mental functioning, when all of the examining and treating

8   providers noted that L.M. tends to address her symptoms through avoidance of painful triggers,

9   which in turn, exacerbates the severity of her symptoms.  For example, Dr. Kalich noted that

10  L.M.'s "depression and anxiety symptoms impact her desire to engage socially and cause her to

11  withdraw from others."  AR 509.  Dr. Kalich further opined that "if [L.M.] continues to manage

12  her anxiety through avoidance, which only reinforces her PTSD symptoms, it is unlikely that her

13  mental health functioning will improve."  *Id.*  Similarly, the June 2017 functional statement by Dr.

14  Bird and Ms. Jennings-Parriott states that L.M. "is poorly engaged due to crisis, retraumatization

15  and multiple psycho social stressors," notes that L.M.'s symptoms include "[a]voidance of

16  external reminders of the event," and that the "severity and chronicity of [L.M.'s symptoms] make

17  it difficult for [her] to engage, follow through and maintain contact with her treatment team."

18  AR 625, 626, 628.  The report by Dr. Franklin and Ms. Childs likewise notes symptoms of

19  avoidance of traumatic stimuli.  AR 635.

20      The opinions of Dr. Kalich, Dr. Franklin/Ms. Childs, and Dr. Bird/Ms. Jennings-Parriott

21  are echoed by L.M.'s other sources, who state that L.M.'s psychiatric symptoms repeatedly cause

22  avoidance and missed treatment appointments.  For example, Ms. Jennings-Parriott noted that

23  L.M. "continues to struggle with attending both medical and behavioral health appointments due

24  to her psychiatric symptoms, which recurrently give rise to avoidance, re-experiencing, numbness

25  (i.e., freezing up and shutting down), and panic attacks."  AR 670.  Ms. Fisher and Ms. Burnich-

26  Line similarly noted that due to her symptoms, L.M. was "unable to consistently make

27  appointments even with repeated reminders" and "despite her strong desire to enter and receive

28  care."  AR 1469, 1471.  Indeed, there are a number of recent records documenting L.M.'s multiple

missed appointments for medical and other treatment. *See, e.g.,* AR 1092 (March 2022 note re missed behavioral health appointment), AR 1098 (March 2022 note re L.M. missed too many optometry appointments), AR 1106 (March 2022 note re missed behavioral health appointment), AR 1156 (March 2022 note re missed behavioral health appointment), AR 1220 (January 2022 note re missed appointment with primary care physician); AR 1226 (January 2022 note re L.M. provided with primary care physician appointment information); AR 1245 (December 2021 note re L.M. reminded of primary care physician appointment); AR 1246 (November 2021 note re attempt to contact L.M. re scheduled appointment); AR 1252 (November 2021 note re L.M. given reminder re primary care physician appointment); *see also* AR 721 (L.M. hearing testimony that she lost contact with therapists after she missed appointments).

Equally unpersuasive is the ALJ's suggestion that the opinions of Dr. Kalich and Dr. Bird/Ms. Jennings-Parriott are entitled to less weight because their opinions were provided early in the adjudicatory period. AR 691, 693-694. As noted above, the ALJ's reference to Dr. Bird/Ms. Jennings-Parriott's June 2017 functional statement as a "2016 opinion" appears to be an error. *See* AR 693. Nor is it apparent that the June 2017 statement, which was proffered a few months before the first ALJ's decision, was "early" in the adjudicatory period. In any event, the fact that the reports of Dr. Kalich and Dr. Bird/Ms. Jennings-Parriott may have been rendered "early" in the adjudicatory period is not a sufficient reason for the ALJ to discount their findings, while crediting those of the non-examining consultants, whose opinions were rendered within two to eight months after Dr. Kalich's report and also predate much of the medical evidence of record. Notably, although the ALJ discounted the opinions of Drs. Daniels and Warren, in part, as inconsistent with the longitudinal record, he apparently did so solely for the conclusion that the record supports no more than mild social interaction limitations. *See* AR 680, 690-691. However, every medical source who examined L.M. or reviewed her records found that she has at least moderate limitations in her social interaction abilities. *See* AR 54, 58, 71, 75, 509, 627-628, 635, 637. It thus appears that in rejecting all of the medical opinions on that point, the ALJ erroneously based his conclusions about L.M.'s social interaction abilities, in part, on his own lay interpretation of the medical evidence. Moreover, as discussed above, the ALJ cherry-picked that

medical evidence from records that, for the most part, did not concern the testing or evaluation of L.M.'s mental functioning. *See, e.g.*, *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1235 (9th Cir. 2011) (ALJ may not substitute his own personal observations of claimant for the opinions of claimant's treating physicians); *Cox v. Kijakazi*, No. C 21-09850 WHA, 2023 WL 4188214, at *8 (N.D. Cal. June 23, 2023) ("The ALJ thus appears to have drawn her own conclusions of claimant's abilities from claimant's daily activities, and discounted the medical opinions divergent from those conclusions. In other words, the ALJ substituted her own lay interpretation of the medical evidence contained in treatment records without deference to that of the treating and examining physicians."); *Corvelo v. Kijakazi*, No C 20-01059 WHA, 2022 WL 1189885, at *5 (N.D. Cal. Apr. 21, 2022) ("Consequently, because the ALJ rejected every medical opinion regarding mental impairments he erroneously based his conclusion on claimant's mental limitations solely on his own lay interpretation of the raw medical evidence contained in claimant's treatment records.").

If the ALJ believed that the evidence was inadequate, he could have referred L.M. to a consulting expert to further clarify and develop the record. *See generally Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). Indeed, in its May 2020 order, this Court expressly stated that the scope of remand was not limited. AR 829. Upon remand, the Appeals Council stated that the ALJ could, among other things, "take any further action needed to complete the administrative record[.]" AR 833. While the ALJ correctly noted that the Social Security Administration provided an opportunity for a consultative examination to which L.M. objected (*see* AR 691 n.1), he referred to a consultative examination that the agency scheduled more than six years ago. The record demonstrates that L.M. and her counsel showed up for the consultative psychological examination, initially scheduled for May 22, 2017, "only to discover that the doctor had already left for the day." AR 336. L.M. also appeared for a second scheduled consultative examination in June 2017, but "[t]he location where the [examination] was supposed to be . . . was an empty boarded up building." AR 340. Noting that Dr. Franklin and Ms. Childs had just examined L.M. on May 17, 2017 and that these appointments were "very stressful to [L.M.]," L.M.'s counsel requested that the consultative examination be canceled or postponed, and submitted a letter by

Ms. Jennings-Parriott, who expressed concern that requiring L.M. to appear for another

psychological examination "could lead to re-traumatization and further decompensation."

AR 334-336, 340, 341; *see also* AR 670.

Substantial evidence does not support the ALJ's conclusion that the opinions of Dr.

Franklin/Ms. Childs and Dr. Bird/Ms. Jennings-Parriott are inconsistent with L.M.'s treatment

history.  To the extent the ALJ discounted the opinions of Dr. Franklin based on inconsistency

with the treatment history, and specifically the generally unremarkable mental status exams in the

record (*see* AR 692), substantial evidence does not support his conclusion for the reasons

discussed above.  With respect to Dr. Bird/Ms. Jennings-Parriott's June 2017 functional statement,

the ALJ found that "the assessment of 'paragraph C' mental listing criteria satisfaction is

inconsistent with the record, which establishes some mental health treatment, but certainly not

ongoing treatment in a highly structured environment."  AR 693.  L.M. correctly notes that the

June 2017 statement and the paragraph C criteria for the Commissioner's 12.15 listing are written

in the disjunctive and thus do not appear to require both mental health treatment *and* a highly

structured environment, as the ALJ seems to suggest.  *See* AR 629, 693; *see also* 20 C.F.R. Pt.

404, Subpart P, App. 1, § 12.15.C.  In any event, the fact that L.M.'s medical record does not

reflect "ongoing treatment in a highly structured environment" is not a substantial basis on which

to conclude that Dr. Bird's and Ms. Jennings-Parriott's assessment of L.M.'s condition is

inaccurate.  *See Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) (stating that a claimant

"may have failed to seek psychiatric treatment for his mental condition, but it is a questionable

practice to chastise one with a mental impairment for the exercise of poor judgment in seeking

rehabilitation.") (internal quotations and citation omitted).  The record indicates that L.M. has

struggled with homelessness.  *See, e.g.,* AR 560, 569, 592, 610, 615, 1119, 1120.  As discussed

above, Dr. Kalich noted that L.M. has trust issues, deals with anxiety through avoidance, and

"prefers not to be around people at all"; Dr. Bird and Ms. Jennings-Parriott described her as

"poorly engaged due to crisis, retraumatization and multiple psychosocial stressors"; Dr. Franklin

and Ms. Childs noted L.M.'s "poor coping skills"; and other sources have noted and documented

L.M.'s difficulties in attending scheduled appointments.  *See* AR 505, 509, 625, 635, 670, 1092,

1098, 1106, 1156, 1220, 1226, 1245, 1246, 1254, 1469, 1471.

### b.       Providers' Own Observations and Findings

The ALJ discounted the opinions of L.M.'s treating and examining medical sources on the ground that the opinions are inconsistent with the sources' own observations and findings.  For example, the ALJ found Dr. Kalich's opinion to be internally inconsistent because she found that during the examination, L.M. "'demonstrated no significant impairment with regard to abilities involving concentration and sustained attention,' but nevertheless assessed potential debilitating limitations with focus due to reported PTSD symptoms."  AR 691-692 (citing AR 509).  The ALJ also stated that Dr. Kalich's overall assessment of moderate social interaction limitations is inconsistent with her own observations that during the examination, L.M. was cooperative and had "good eye contact, normal speech, and intact communicative abilities."  AR 691.  Similarly, with respect to the report by Dr. Franklin/Ms. Childs, the ALJ found the "'marked' limitations with attention and concentration and 'extreme' limitations with adaption" to be inconsistent with their findings that L.M. has "'average' IQ scores, a generally 'mild' cognitive impairment, the ability to complete a battery of testing, and composite attention and concentration scores within the average range."  AR 692.  The ALJ likewise stated that while Dr. Bird "observe[d] a depressed and anxious mood, intermittent eye contact, and slumped posture" during her April 2017 examination, she also "noted clear speech, logical thought processes, normal perception, normal thought content, normal cognition, a cooperative attitude, normal activity, normal appearance, estimated average intelligence, normal insight, and only 'mild' impairment with judgment."  AR 693.

The fact that L.M. was cooperative and demonstrated generally normal abilities to think and speak during examinations does not undermine  assessments by Dr. Kalich, Dr. Franklin/Ms. Childs, and Dr. Bird/Ms. Jennings-Parriott that L.M. had limitations in mental functioning.  Their respective reports indicate that the assessed mental limitations are largely due to L.M.'s impaired memory, depression, and PTSD.  *See* AR 507-509, 625-629, 631-637.  It is therefore not apparent that there is any inconsistency between the findings that L.M. experiences limitation-causing symptoms associated with her chronic mental conditions and the finding that she has, for example, an average IQ and a generally normal ability to speak and think.  Moreover, as other courts have

observed, a claimant's ability to cooperate with healthcare providers is not necessarily indicative of the severity of her mental impairments. *See Wranich v. Kijakazi*, No. 3:22-cv-0119-HRH, 2022 WL 16960900, at *5 (D. Alaska Nov. 16, 2022) ("That plaintiff might have been cooperative with his medical providers says little about whether or not his mental impairments are severe."); *T.N.*, 2021 WL 4553581 at *9 ("The fact that Plaintiff was alert does not mean that Plaintiff does not have significant cognitive impairments. Nor does the fact that, in a structured clinical environment, with a trained mental health professional, Plaintiff was able to make good eye contact, was cooperative, and put forth adequate effort on testing mean that Plaintiff would be able to interact appropriately with coworkers and supervisors in the entirely different context of a full-time mandatory work environment."); *Tina R. v. Comm'r Soc. Sec.*, No. C18-1041JLR, 2019 WL 1417301, at *5 (W.D. Wash. Mar. 29, 2019) ("Plaintiff's healthcare providers are professionals trained to deal with mentally and physically ill or disabled patients. Furthermore, a medical treatment relationship is not like the relationship a worker has with her coworkers, supervisors, or the general public. The goals and nature of interacting with healthcare providers is different."); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.C.6.b. (claimant's "ability to complete tasks in settings that are highly structured, or that are less demanding or more supportive than typical work settings does not necessarily demonstrate [the claimant's] ability to complete tasks in the context of regular employment during a normal workday or work week.").

### c.      Other Evidence

The ALJ discounted the opinions of Dr. Franklin/Ms. Childs, finding that L.M.'s "post-application date work as a dishwasher in 2019/2020 (with no significant alleged mental limitations) to be wholly inconsistent with the assessed 'extreme' limitations with adaption to normal work stressors and changes in the routine work setting." AR 692 (citing "Hearing Testimony"). This conclusion is not supported by substantial evidence. Indeed, the Ninth Circuit has recognized that "[o]ccasional symptom-free periods—and even the sporadic ability to work—are not inconsistent with disability." *Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995), *superseded on other grounds by regulation, as recognized in Farlow*, 53 F.4th at 488. The record demonstrates that L.M. worked briefly as an "on call" dishwasher in 2019 and 2020, and indicates

that the work was minimal.  According to L.M.'s hearing testimony, she took that job to get away

from her abusive partner; she worked three to four hours a couple of times per week; and she

would be out sick three or four days per month.  AR 717, 728-729, 733.  As the ALJ found, L.M.'s

dishwashing work did not rise to the level of substantial gainful activity.  *See* AR 677-678, 1034-

1035.  The ALJ noted that L.M. testified that she stopped working as a dishwasher due to the onset

of the COVID-19 pandemic and because of her physical pain.  AR 678, 718.  However, there is no

evidence in the record about the mental abilities required to perform that work, including the

extent of contact with others required for that job.  Thus, there is nothing to suggest that L.M.'s

brief work as an on-call dishwasher is inherently inconsistent with assessed limitations about her

mental functioning.  The record shows that L.M. had otherwise not worked from 2008 to 2013 and

last earned $1,683.00 in 2014 and $647.00 in 2015 in self-employment earnings that she believed

may have been tips from cutting hair while she was in barber college.  AR 677, 1034-1035.  It was

error for the ALJ to rely on a brief and isolated period during which L.M. performed some

dishwashing work in discounting Dr. Franklin/Ms. Child's opinion.

The Commissioner offers a number of arguments, not articulated by the ALJ, regarding

claimed inconsistencies between L.M.'s activities and the opinions of Drs. Kalich, Franklin, and

Bird.  *See* Dkt. No. 24 at 9.  The Court reviews only those reasons asserted by the ALJ.  *See*

*Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015) (courts "are constrained to *review* the

reasons the *ALJ* asserts.") (internal quotations and citation omitted).

The Court also readily disposes of the ALJ's additional reason for discounting Dr. Kalich's

opinion due to what he characterized as "equivocal, vague, and vocationally imprecise terms (i.e.,

'moderate,' 'may,' 'likely') . . .."  *Id*.  L.M. correctly notes that the Commissioner's own

regulations use the term "moderate."  *See, e.g.,* 20 C.F.R. Pt. 404, Subpart P, App. 1, § 12.00.F.2

("We evaluate the effects of your mental disorder on each of the four areas of mental functioning

based on a five-point rating scale consisting of none, mild, moderate, marked, and extreme

limitation.").  The ALJ did not elaborate on what portions of Dr. Kalich's opinion he found

unacceptably vague or imprecise, or the particular reasons why he reached that conclusion.  *See*

AR 691.  The Commissioner's attempt to expound on what she believes the ALJ may have meant

1   (*see* Dkt. No. 24 at 10) is not persuasive.[18]

2                                                    * * *

3          In sum, the ALJ did not provide specific and legitimate reasons, supported by substantial

4   evidence, to discount the opinions of L.M.'s examining and treating medical sources, in favor of

5   those of the non-examining state agency consultants.

6                    **5.       Analysis of Other Source Opinions**

7          The ALJ assigned "little weight" to the opinions of Ms. Jennings-Parriott, LCSW, Audrey

8   Fisher, RN, and community health worker Dani Burnich-Line, stating that their opinions are

9   inconsistent with their own treatment records and with other record evidence.  AR 694-695.

10  While these can be germane reasons for rejecting or discounting the opinions of other sources, on

11  the record presented, the ALJ's reasons are not supported by substantial evidence.

12         To the extent the ALJ discounted these opinions based on the same generally unremarkable

13  mental status exams cited with respect to the medical source opinions (*see* AR 511, 517, 535, 573,

14  577, 583, 588, 605, 1089, 1122, 1154, 1262, 1332-1333, 1458, 1481), those mental status exams

15  are not substantial evidence for the reasons discussed above.  *See, e.g., L.L.*, 2022 WL 2833972 at

16  *12; *T.N.*, 2021 WL 4553581 at *9.

17         With respect to Ms. Jennings-Parriott, the ALJ also took issue with the portion of her June

18  2017 letter in which she opined that L.M. "has great difficulties participating in social situations

19  due to her trauma history, which interferes with accurate reasoning and sound judgment."

20  AR 670; *see also* AR 694.  The ALJ found this particular statement to be "directly contradicted by

21  Ms. Jennings-Parriott's own treatment records, which state[] that the claimant exhibited normal

22  insight and judgment."  AR 694 (citing AR 592-593).  Here, the ALJ cites to an August 8, 2016

23  progress report in which Ms. Jennings-Parriott noted that L.M.'s insight was "[w]ithin normal

24

25  ────────────────
    [18] Moreover, the Commissioner mischaracterizes the record to the extent that she suggests that Dr.
26  Kalich's opinion is vague because she opined that "[L.M.'s] symptoms were 'most impactful' on
    her activities of daily living[.]"  Dkt. No. 24 at 10.  As discussed above, in that portion of her
27  report, Dr. Kalich drew a distinction between L.M.'s impairments, finding that while her daily
    activities are affected by her impaired memory, it is her depression and PTSD "that are the most
28  impactful with regard to her ability to complete tasks of daily living."  AR 508.

United States District Court
Northern District of California

1    limits." AR 593.  With respect to L.M.'s judgment, however, the report is equivocal and states

2    that while L.M.'s judgment was "[w]ithin normal limits," L.M. also exhibited an "[i]mpaired

3    ability to make reasonable decisions." *Id*.  Moreover, Ms. Jennings-Parriott's other observations

4    in that same report indicate that L.M.'s mental functioning was not normal, including that L.M.

5    was tearful, sad, withdrawn, and presented with a flat affect, slumped posture, slowed activity,

6    anxious attitude, avoidant eye contact, and tangential thought process.  AR 592-593.  L.M.'s

7    symptoms stemming from her chronic depression and PTSD are documented throughout the

8    record.  *See, e.g.,* 505-507, 560, 561, 565, 577, 588, 592-593, 616-617, 632-634, 641-642, 721,

9    1067, 1092, 1098, 1106, 1156, 1220, 1226, 1245, 1246, 1254.  For the reasons discussed above, it

10   is not apparent that there is any inconsistency between Ms. Jennings-Parriott's notation that L.M.

11   demonstrated normal insight on a particular day, and her opinion that L.M. experiences limitation-

12   causing symptoms associated with her chronic mental conditions.  *See Wranich*, 2022 WL

13   16960900 at *5; *T.N.*, 2021 WL 4553581 at *9; *Tina R.*, 2019 WL 1417301 at *5; *see also* 20

14   C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.C.6.b.

15          With respect to Ms. Fisher and Ms. Burnich-Line, the ALJ found that their opinions have

16   "no support in the form of objective medical evidence," stating that their treatment records "do not

17   include any any [sic] consistent positive objective signs supporting the functional limitations,

18   which the providers assert are work preclusive."  AR 694.  While the ALJ initially cited to several

19   hundred pages of exhibits, he noted, in particular, that a March 11, 2022 mental status examination

20   conducted by Ms. Fisher shows that L.M. "exhibited no signs indicative of functional limitations;

21   the claimant exhibited an appropriate mood and affect and organized speech content."  AR 694

22   (citing AR 1155).  The cited record, however, documents an encounter on the street between L.M.

23   and a medical outreach team that provided her with treatment for an infection.  There is no

24   indication that L.M.'s mental functioning was tested or formally examined.  AR 1154-1155.  For

25   the reasons discussed above, the fact that the record notes that L.M. displayed "appropriate mood

26   and affect" and "[o]rganized speech content" are not substantial evidence of an inconsistency with

27   Ms. Fisher's and Ms. Burnich-Line's opinions about L.M.'s limitations stemming from her

28   depression and PTSD symptoms.  *See Wranich*, 2022 WL 16960900 at *5; *T.N.*, 2021 WL

4553581 at *9; *Tina R.*, 2019 WL 1417301 at *5; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.C.6.b.  Moreover, as previously discussed, their observations about L.M.'s difficulties engaging in treatment are reflected in a number of recent records documenting L.M.'s multiple missed appointments for medical and other treatment.  *See, e.g.,* AR 1092, 1098, 1106, 1156, 1220, 1226, 1245, 1246, 1254; *see also* AR 721.

The ALJ also discounted Ms. Fisher and Ms. Burnich-Line's opinions, stating that "[t]he core assessment of debilitating functional limitations is similarly inconsistent with other medical evidence existing in the record at or around the time of the assessment[.]"  AR 694.  Here, the ALJ cites in particular to the March 16, 2022 behavioral health assessment that noted L.M.'s remark that she "thinks that current Zoloft [prescription] is really helpful" and observed that she was alert, and exhibited normal speech, thought, and perception, and demonstrated "fair" insight and judgment.  AR 694 (citing AR 1122).  However, observations regarding periods of improved mood or energy "must be read in context of the overall diagnostic picture the provider draws."  *Ghanim*, 763 F.3d at 1162 (internal quotations and citation omitted).  "The fact that a person suffering from depression makes some improvement does not mean that the person's impairment [] no longer seriously affect[s] [her] ability to function in a workplace."  *Id.* (internal quotations and citations omitted).  As discussed above, the cited March 2022 behavioral health assessment also notes L.M.'s "depressed, nervous and anxious" mood and a PHQ-9 score indicating severe depression, and assesses PTSD and a moderate episode of recurrent major depressive disorder.  AR 1122-1123.  And, the record as a whole reflects that L.M. suffered severe symptoms from chronic depression and PTSD.  *See, e.g.,* AR 505-507, 560, 561, 565, 577, 588, 592-593, 616-617, 632-634, 641-642, 721, 1067, 1092, 1098, 1106, 1156, 1220, 1226, 1245, 1246, 1254.

* * *

In sum, the ALJ failed to provide germane reasons, supported by substantial evidence, for discounting the opinions of L.M.'s other sources.

**B.     L.M.'s Statements**

At the May 12, 2022 hearing, L.M. testified that she lives with her dog in a recreational vehicle ("RV").  AR 722, 725.  On a typical day, she may interact with people she knows in the

1   area four or five times as they "pass by" and have a five-minute conversation with them;

2   otherwise, she mostly stays in the RV with her dog.  AR 722-723, 725-726.  With respect to

3   activities, L.M. stated that she "eat[s] twice a day, but [is] eating out of cans" and "not really

4   cooking."  AR 730.  She does laundry every two weeks, and cleans her RV or folds her clothes in

5   twenty-minute intervals about four or five times throughout the day, taking breaks in between due

6   to pain.  AR 730-731.  L.M. further testified that reading helps her, and she "read[s] a lot because

7   [she] has to go over what [she] read" to understand what she is reading, and cannot read

8   continuously for hours because her "brain . . . gets jumbled if [she] put[s] too much information in

9   there[.]"  AR 731-732; *see also* AR 722.  L.M. does not have a current driver's license; she

10  testified that if she needs to go someplace, she walks or takes short trips on her bicycle.  AR 716.

11  Twice a week, for about an hour a day, L.M. looks for materials to recycle.  She stated that she

12  spends twenty minutes collecting cans, then rests for ten minutes, and then keeps looking for cans

13  for another twenty minutes before stopping.  AR 722, 724, 725.

14      L.M. testified that on days when her physical and/or mental symptoms are bad, she stays in

15  and does not open the window.  AR 726.  For her back pain, she tries to remember things she

16  learned in physical therapy and move around, and takes Flexeril or applies a cream for temporary

17  relief.  AR 726-727.  With respect to her mental symptoms, L.M. testified that she experiences

18  "[t]raumatic fear" and "crippling anxiety," "feels unprotected [and] . . . preyed upon even though

19  no one's at [her] at that time," and "[doesn't] know how to trust . . . [her] surroundings or . . . the

20  world."  AR 727.  Her mental health symptoms fluctuate and are sometimes worse and sometimes

21  a little better.  AR 728.

22      The ALJ found that L.M. has severe medically determinable impairments of degenerative

23  disc disease, scoliosis, affective disorders, anxiety disorder, PTSD, and cocaine use disorder, and

24  that these impairments reasonably can be expected to cause L.M.'s alleged symptoms.  AR 678,

25  683.  However, he found that L.M.'s allegations regarding the intensity, persistence, and limiting

26  effects of her symptoms are not entirely consistent with the medical evidence and other record

27  evidence.  AR 683.  L.M. contends that the ALJ failed to provide clear and convincing reasons,

28  based on substantial evidence, for discounting her statements about the alleged severity of her

United States District Court
Northern District of California

31

symptoms.

### 1.    Legal Standard

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional impairment.  *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1106 (9th Cir. 2014) (internal quotations and citation omitted).  In assessing a claimant's subjective testimony, an ALJ conducts a two-step analysis.  First, "the claimant 'must produce objective medical evidence of an underlying impairment' or impairments that could reasonably be expected to produce some degree of symptom."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Smolen*, 80 F.3d at 1281-82).  If the claimant does so, and there is no affirmative evidence of malingering, then the ALJ can reject the claimant's testimony as to the severity of the symptoms "'only by offering specific, clear and convincing reasons for doing so.'"  *Id.* (*quoting Smolen*, 80 F.3d at 1281); *see also Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) ("We therefore review the ALJ's discrediting of Claimant's testimony for specific, clear, and convincing reasons.").  That is, the ALJ must make an assessment "with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.'"  *Tommasetti*, 533 F.3d at 1039 (quoting *Thomas*, 278 F.3d at 958).  "This is not an easy requirement to meet:  The clear and convincing standard is the most demanding required in Social Security cases."  *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017) (quotations and citation omitted).  General findings are not sufficient to meet this standard; an ALJ "must state which pain testimony is not credible and what evidence suggests the complaints are not credible."  *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993).

An ALJ may consider several factors, including (1) ordinary techniques of credibility evaluation; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  *Tommasetti*, 533 F.3d at 1039.  Additionally, an ALJ may also consider the observations of treating and examining physicians and other third parties concerning the nature, onset, duration, and frequency of the claimant's symptoms; precipitating and aggravating factors; and functional restrictions caused by the symptoms.  *Smolen*, 80 F.3d at 1284.  "Although lack of medical evidence cannot form the

sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis." *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005); *see also Smartt v. Kijakazi*, 53 F.4th 489, 498 (9th Cir. 2022) ("When objective medical evidence in the record is *inconsistent* with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony."). However, "an ALJ cannot insist on clear medical evidence to support each part of a claimant's subjective pain testimony when there is no objective testimony evincing otherwise." *Smartt*, 53 F.4th at 498. "That is, an ALJ cannot effectively render a claimant's subjective symptom testimony superfluous by demanding positive objective medical evidence 'fully corroborat[ing]' every allegation within the subjective testimony." *Id*. (quoting *Burch*, 400 F.3d at 681). "If the ALJ's finding is supported by substantial evidence, the court 'may not engage in second-guessing.'" *Tommasetti*, 533 F.3d at 1039 (quoting *Thomas*, 278 F.3d at 959).

In this case, there is no affirmative evidence or any finding of malingering. The ALJ therefore is required to provide specific, clear and convincing reasons for discounting L.M.'s statement regarding her symptoms. *Tommasetti*, 533 F.3d at 1039.

### 2.    L.M.'s physical symptoms

The ALJ found L.M.'s statements regarding the severity and limiting effects of her physical symptoms to be inconsistent with the opinion evidence, objective medical evidence, and her reported activities.

With respect to the opinion evidence regarding L.M.'s physical functioning, the ALJ gave "significant weight" to the opinions of examining consultant Todd Nguyen, D.O. and non-examining state agency consultant H. Samplay, M.D., and "little weight" to the opinion of L.M.'s primary care physician, Kevin Critchlow, M.D.  AR 684-686.  As noted above, L.M. does not appear to challenge the ALJ's decision to give "significant weight" to Dr. Nguyen's opinion; nor does she directly challenge the ALJ's decision to give "significant weight" to Dr. Samplay's opinion.  However, in the context of the evaluation of her statements regarding her symptoms, L.M. argues that the ALJ erred in giving more weight to Dr. Samplay's opinions from years ago, than to Dr. Critchlow's 2022 opinion, the most recent opinion in the record regarding her physical functioning.  *See* Dkt. No. 21 at 19-20; *see also Orn v. Astrue*, 495 F.3d 625, 633-34 (9th Cir.

33

2007) (stating that "the nature and extent of the physicians' relationships with [claimant] adds significant weight to their opinions," and noting that one physician provided "the most recent report in the record.").  For the reasons discussed below, the Court agrees that the ALJ's decision to discount Dr. Critchlow's opinion is not supported by substantial evidence.

Dr. Nguyen conducted an orthopedic examination of L.M. in October 2014.  AR 510-513. He noted "minimal scoliosis" and "tenderness to palpation to the trochanteric bursa on the left consistent with the bursitis," but otherwise found that she had normal range of motion in all major joints, as well as a normal neurologic exam "with normal strength, symmetric reflexes, and intact sensation."  AR 513.  Dr. Nguyen opined that L.M. "would be expected to walk, stand, and sit up to six hours with breaks every two hours"; "would be capable of lifting 50 pounds frequently and 100 pounds occasionally"; "should be able to perform frequent bending, stooping, kneeling, crawling, and stair climbing"; had no environmental limitations; and did not need an assistive device.  *Id.*  The ALJ gave Dr. Nguyen's opinion "significant weight because it is supported by Dr. Nguyen's physical examination and the negative objective signs documented in that report," and "is consistent with the treatment record through 2022, which again repeatedly shows negative objective clinical signs indicative of overall intact physical functioning."  AR 685 (citing AR 517, 535, 1089, 1155, 1303, 1324, 1452, 1481, 1483, 1493).

In November 2014, on the initial review of L.M.'s claims, Dr. Samplay reviewed L.M.'s records, including Dr. Nguyen's report.  Dr. Samplay opined that "[a] medium RFC is very appropriate—due to history of back pain and left knee pain," and found that L.M. could lift fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk about six hours in an eight-hour day; sit about six hours in an eight-hour day; and had unlimited abilities to push and/or pull, other than as shown for her ability to lift and/or carry.  AR 56-57.  On reconsideration of L.M.'s claims in February 2015, Dr. Samplay affirmed these findings.  AR 70, 73-74.  The ALJ gave Dr. Samplay's opinions "significant weight because the lack of more significant physical limitations is consistent with negative objective clinical signs documented in the record" and because Dr. Samplay's findings are supported by "review of the then-existing medical record and citation to relevant negative objective signs (including the negative signs in the consultative

1    examination report)."  AR 684-685 (citing 510-513, 517, 534-535, 573, 577, 1089, 1154, 1155,

2    1262, 1303, 1324, 1452, 1477-1500).

3          Dr. Critchlow began treating L.M. as her primary care physician in July 2021.  *See*

4    AR 1058, 1473.  On May 5, 2022, he completed a physical RFC questionnaire.  AR 1473-1475.

5    Noting L.M.'s diagnosis of chronic bilateral back pain without sciatica, Dr. Critchlow found that

6    L.M. can lift and/or carry twenty pounds occasionally and ten pounds frequently; can stand and

7    walk about two hours in an eight-hour day; can sit about two hours in an eight-hour day; can sit

8    for thirty minutes and stand for sixty minutes before changing position; must walk around every

9    fifteen minutes (in five minute intervals); and needs to lie down every two to three hours.

10   AR 1474.  Dr. Critchlow also assessed certain postural limitations, including that L.M. can never

11   twist or crouch, can occasionally stoop and climb stairs, and "lacks core stability to control"

12   reaching, handling, pushing, and pulling movements.  *Id*.  Dr. Critchlow opined that L.M.'s

13   impairments or treatments would cause her to be absent from work about three times per month

14   and that her pain and/or medications would interfere with her ability to attend, concentrate and

15   maintain pace about 15% of a workday.  AR 1475.

16         The ALJ's decision to give Dr. Critchlow's opinion "little weight" is based, in part, on a

17   lack of support in Dr. Critchlow's own May 5, 2022 chart note, which Dr. Critchlow expressly

18   referenced in the May 2022 physical RFC questionnaire.  The ALJ correctly observed that Dr.

19   Critchlow's May 5, 2022 chart note does not cite any psychological abnormalities.  AR 686 (citing

20   AR 1479-1481).  And when asked to identify the medical findings supporting his assessed

21   limitations regarding L.M.'s exertional and postural limitations, Dr. Critchlow wrote:  "observed

22   difficulty with various gaits, bending and squatting" and "See exam chart note dated 5/5/22."

23   AR 1474, 1475.  The ALJ correctly noted that Dr. Critchlow's May 5, 2022 chart note is

24   unremarkable, does not document observed difficulties with "various gaits, bending, or squatting,"

25   and indicates that L.M. denied joint pain, joint swelling and myalgia and weakness and numbness,

26   had an unlabored gait, and was in no acute distress.  AR 686, 1479-1481 *see also* AR 1482-1500.

27         However, substantial evidence does not support the ALJ's decision to give Dr. Critchlow's

28   opinion little weight based on a finding that the opinion is contradicted by Dr. Critchlow's earlier

United States District Court
Northern District of California

treatment notes and by objective medical evidence documented in the record as a whole. In crediting the opinions of Drs. Nguyen and Samplay and discounting that of Dr. Critchlow, the ALJ found that "[d]espite the claimant's medically determinable back impairments, the claimant's allegations of debilitating weakness, mobility problems, and exertional limitations are out of proportion to objective medical evidence documented during physical examinations." AR 684. The ALJ correctly noted that L.M.'s medical records generally indicate no acute distress or overt pain behavior (AR 534-535, 1089, 1154, 1324, 1452); no reduced extremity strength, abnormal sensation, reflex or coordination issues, atrophy, or muscle wasting (AR 510-513, 1262, 1303, 1452, 1477-1500); generally normal musculoskeletal range of motion and extremity inspection (AR 510-513, 517, 573, 577, 1303, 1324, 1452); negative straight leg raising (AR 510-513, 1283); and normal unassisted gait (AR 510-513, 517, 535, 1089, 1155, 1303, 1324, 1452, 1481, 1483, 1493). *See* AR 684. Nevertheless, viewing the record as a whole, it is not clear that Dr. Critchlow's opinion is contradicted by these records or by his earlier treatment notes.

Notably, the record does not demonstrate that L.M. claimed that her back pain prevented her from walking or moving normally; rather, the record indicates that she asserted that her back pain impacted the *duration* of her activities, e.g., how long and how far she can walk, and her ability to sit or stand for long periods. For example, in his July 30, 2021 treatment note, Dr. Critchlow documents L.M.'s complaints of back pain, "predominantly left paraspinal near scapula and bilat[eral] lumbar. Not radiating." AR 1282. A physical examination revealed an unlabored gait, a negative straight leg test, and no spinal process tenderness, but did show "[tenderness to palpation] over thoracic left paraspinal area, diffuse lumbar tenderness." 1283.[19] Dr. Critchlow noted an indication for chronic bilateral low back pain without sciatica, and ordered x-rays. AR 1283, 1284.

A subsequent treatment note dated February 16, 2022 indicates that L.M. denied joint pain,

---

[19] Similar findings are noted in earlier treatment notes of another provider, Kevin Lagor, NP. *See* AR 577 (August 12, 2016 progress note documenting normal "[v]isual overview of all four extremities," but finding "[t]enderness on palpation of muscle tension on left interior edge of trapezius and lower back" and observing that L.M. "appear[s] to be in much distress."); AR 1462 (June 23, 2017 progress note documenting "[n]o visible scoliosis on exam" and normal "[v]isual overview of all four extremities," but finding "[t]enderness on palpation of left scapular region.").

swelling, and myalgias (AR 1196), but reported ongoing symptoms that "limit[] ability to prolonged sit or stand" (AR 1194). Dr. Critchlow noted: "Will need imaging." AR 1194. During a physical exam, he found that LM had an unlabored gait, stood without assistance, and showed "no marked deformity of spinous processes," but nonetheless had "[l]eft paraspinal tenderness." AR 1197. By the time of her March 16, 2022 visit with Dr. Critchlow, L.M. had still not had x-rays of her back. *See* AR 1132. She continued to endorse back pain, while denying swelling and myalgias, and reported that cyclobenzaprine had not helped. AR 1134. Dr. Critchlow prescribed Voltaren (diclofenac sodium) as needed for L.M.'s back pain. *Id*.

X-rays of L.M.'s lumbosacral spine on March 29, 2022 did not reveal the cause of her reported back pain. AR 1205-1206. The images showed no scoliosis or acute radiographic abnormality, but the radiologist noted that "further evaluation with CT scan, MRI scan or bone scintigraphy might identify significant radiographically occult or subtle abnormality." AR 1206. In a March 31, 2022 progress note, Dr. Critchlow stated that L.M. continued to deny musculoskeletal swelling and myalgias, but complained of ongoing back pain, "[h]urting on right upper back, also bilateral lower back. Uncomfortable sitting down or with prolonged standing. Limiting her ability to get around, take care of herself. Can walk unassisted, but limits duration and how much she leaves her area." AR 1089. During a physical examination, L.M. had an unlabored gait and could stand unassisted. *Id*. Noting that x-rays did not reveal the cause of her reported ongoing back pain, Dr. Critchlow referred L.M. for an MRI of her spine. AR 1090.

A May 6, 2022 MRI of L.M.'s thoracic spine revealed "[m]inimal scattered degenerative changes as detailed without significant spinal canal or neural foraminal narrowing." AR 1503. However, an MRI of her lumbar spine showed "[r]ight foraminal disc protrusion with annular fissure at L2-L3 which abuts the exiting right L2 nerve root," "[m]oderate bilateral L2-L3, L3-L4, L4-L5, L5-S1 neural foraminal narrowing," "[a]dditional multilevel degenerative changes as detailed without significant spinal canal narrowing," and "[b]ilateral sacral Tarlov cysts, larger on the right measuring up to 2 cm." AR 1502.

As acknowledged by the ALJ, the May 6, 2022 MRI of L.M.'s lumbar spine shows abnormalities. *See* AR 684. It is unclear to what extent those abnormalities might impact L.M.'s

physical functioning, as there is no medical opinion evidence regarding the MRI findings. Nevertheless, on the record presented, the Court does not find substantial evidence supporting the ALJ's conclusion that Dr. Critchlow's opinion is contradicted by his earlier treatment records or by objective medical evidence in the record as a whole.

There is also no substantial evidence to support the ALJ's decision to discount L.M.'s allegations regarding the limiting effects of her physical symptoms based on her activities.  While a claimant's daily activities may be considered in evaluating the claimant's testimony regarding her symptoms, those activities may be grounds to discredit a claimant's statements only in limited circumstances: (1) where the activities are incompatible with the severity of the alleged symptoms or (2) where a claimant is able to spend a substantial part of the day engaged in activities that are transferable to a work setting.  *Orn*, 495 F.3d at 639.  "The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." *Smolen*, 80 F.3d at 1284 n.7.  Merely because a disability plaintiff carries on certain daily activities "does not in any way detract from her credibility as to her overall disability." *Orn*, 495 F.3d at 639 (citation omitted).  Here, the ALJ found allegations of significant functional limitations to be inconsistent with L.M.'s reported "ability to walk, collect recyclable materials, ride a bike, and perform cleaning, which indicates some intact physical functionality." AR 684.  As discussed above, the record indicates that L.M. alleged that her physical symptoms affect the duration of her activities.  That is not inconsistent with evidence indicating that L.M.'s recycling and cleaning activities were limited and performed in twenty minute intervals, with intervening breaks.  *See* AR 724, 725, 730-731.  While there are no details about how often or how far L.M. walks or bikes if she needs to go somewhere, the record evidence suggests that those activities were also limited to short trips.  *See* AR 716.

In sum, viewing the record as a whole, the Court finds that the ALJ did not provide clear and convincing reasons, supported by substantial evidence, to discount L.M.'s statements regarding her physical symptoms.

### 3.     L.M.'s mental symptoms

With respect to L.M.'s mental functioning, the ALJ found L.M.'s statements regarding the severity and limiting effects of her symptoms to be inconsistent with the opinion evidence, objective medical evidence, and her reported activities.  AR 686-695.

For the reasons discussed above, the ALJ erred in evaluating the opinion evidence regarding L.M.'s mental impairments and in giving more weight to the opinions of the non-examining state agency consultants than to those of providers who treated or examined L.M.

With respect to the objective medical evidence, to the extent the ALJ discounted L.M.'s statements based on the generally unremarkable mental status examinations discussed above (*see* AR 688 (citing AR 511, 517, 535, 573, 577, 583, 588, 593, 605, 1089, 1154, 1262, 1332-1333, 1458, 1481)), those records are not substantial evidence of an inconsistency with L.M.'s allegations regarding her mental symptoms.  *See, e.g., L.L.*, 2022 WL 2833972 at *12; *T.N.*, 2021 WL 4553581 at *9.  The ALJ also cites to the single March 2022 behavioral assessment in which L.M. remarked that she found a Zoloft prescription helpful, and generally was alert, and exhibited normal speech, thought, and perception, and "fair" insight and judgment.  AR 688 (citing AR 1122).  For the reasons discussed above, that March 2022 assessment is not substantial evidence of an inconsistency with L.M.'s allegations, when that same report, and the record as a whole, indicates that L.M. continued to suffer from symptoms of ongoing severe depression and PTSD. *See* AR 1122-1123; *see also, e.g.,* AR 505-507, 560, 561, 565, 577, 588, 592-593, 616-617, 625, 632-634, 641-642, 721, 1067, 1092, 1098, 1106, 1156, 1220, 1226, 1245, 1246, 1254.

The ALJ also found L.M.'s allegations to be inconsistent with her "reported activities of daily living and actual work activity since the application date," which he stated "is indicative of intact mental functionality, including with respect to the ability to interact appropriately with others in the workplace, maintain persistence, understand information, and adapt to workplace changes."  AR 689.  Here, the ALJ noted that L.M.'s hearing testimony, as well as certain October 2014 records (i.e., a pain questionnaire and function report L.M. filled out on October 23, 2014, and Dr. Nguyen's October 26, 2014 orthopedic examination) show "that since the application date, the claimant has been able to utilize public transportation to travel, prepare her own meals, pay

bills, count change, reads, attend barber school, perform household chores, and cut hair." AR 689 (citing AR 261, 264-265, 511). The ALJ also found L.M.'s allegations to be inconsistent with certain February 2, 2015 statements by her former boyfriend, Wardell Brim, that L.M. did not "need reminders to take medication or to go to school or other appointments[.]" AR 732. Although the ALJ ultimately gave Mr. Brim's third party function report "little weight,"[20] he correctly noted that during the May 12, 2022 hearing, L.M. agreed that those particular statements were "probably true back then[.]" *See* AR 300, 683, 689, 732. The ALJ further found L.M.'s statements to be inconsistent with her "ongoing work activity collecting recyclable materials, which she alleges, is limited by physical impairments," and her work in 2019 and 2020 as a dishwasher that L.M. testified she stopped doing "due to the COVID-19 pandemic and physical (not mental) limitations." AR 689; *see also* AR 718.

The ALJ did not, however, discuss which, if any, of the identified activities are transferable to a work setting; nor does the record substantiate a conclusion that L.M. spends a substantial part of her day engaged in any such activities. *See Orn*, 495 F.3d at 639. The ALJ also does not explain how L.M.'s activities demonstrate "intact mental functionality, including with respect to the ability to interact appropriately with others in the workplace, maintain persistence, understand information, and adapt to workplace changes." AR 689. Indeed, it is not readily apparent that L.M.'s described activities of attending to her personal hygiene, taking public transportation, ability to handle money, and engaging in daily activities at home are inconsistent with her testimony that she has difficulty being around other people most of the time due to feelings of "[t]raumatic fear," and "crippling anxiety" and trust issues. AR 727. Moreover, L.M.'s overall work history—including attending barber school in 2014 and limited work as a dishwasher in 2019 and 2020—is sporadic and entirely consistent with her testimony of how her mental health symptoms, which fluctuate and are sometimes better and sometimes worse, impact her ability to work. *See* AR 728; *Lester*, 81 F.3d at 830 ("Occasional symptom-free periods—and even the

---

[20] In giving "little weight" to Mr. Brim's third party function report, the ALJ acknowledged L.M.'s hearing May 2022 hearing testimony "that she no longer has a relationship with Mr. Brim, that he abused her, and that he supplied cocaine to her." AR 683; *see also* AR 695.

sporadic ability to work—are not inconsistent with disability.").  Accordingly, the mere fact that L.M. carried on these activities does not constitute substantial evidence to support the ALJ's decision to discount his statements as to the severity of his symptoms.

* * *

In sum, the ALJ failed to provide clear and convincing reasons, supported by substantial evidence, to discount L.M.'s statement regarding the severity of her physical and mental health symptoms.

### C.    12.15. Listing

At step three of the sequential analysis, the ALJ found that "[t]he severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, and 12.15."  AR 679.  In making that finding, the ALJ concluded that L.M.'s impairments did not satisfy the "paragraph B" or "paragraph C" criteria of each listed impairment.  AR 679-681.

With respect to the Commissioner's 12.15 listing, L.M. argues that the ALJ erred in assessing the severity of her mental health conditions, and selectively chose portions of L.M.'s record to portray her conditions as less severe than the record shows them to be.  The Court agrees for the reasons discussed above.  Additionally, because the ALJ improperly discredited L.M.'s testimony regarding her symptoms and failed to provide legally sufficient reasons to discount the opinions of her treating and examining medical and other sources, he failed to "use all of the relevant medical and non-medical evidence in [L.M.'s] case record to evaluate [her] mental disorder[s]."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00.F.3.a.; *see T.J. v. Saul*, No. 19-cv-06516-LB, 2020 WL 7664464, at *8 (N.D. Cal. Dec. 21, 2020) ("[T]he ALJ misweighed the medical opinion[s].  This affects the step-three determination.  The ALJ thus erred here too.").[21]

## IV.    DISPOSITION

Having found that the ALJ committed reversible error, the Court proceeds to the question of remedy.  L.M. argues that remanding for the calculation and award of benefits is appropriate in

---

[21] The Court addresses below, in more detail, the parties' arguments regarding the ALJ's findings regarding the Commissioner's 12.15 listing and his findings at step five the sequential analysis.

United States District Court
Northern District of California

this case. Dkt. No. 21 at 24-25. The Commissioner disagrees, arguing that, if the Court reverses, the proper remedy is remand for further administrative proceedings. Dkt. No. 24 at 19-20. The Commissioner does not state what purpose further proceedings would serve or what evidence is still needed to complete the record; she argues only that if the Court "finds legal error, this Court should remand for further administrative proceedings so that the Commissioner may correct any error." *Id*. at 20.

"When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citing *Treichler*, 775 F.3d at 1099. Under the credit-as-true rule, the Court may order an immediate award of benefits only if three conditions are met. First, the Court asks "whether the 'ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.'" *Id*. (quoting *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014)). Next, the Court "determine[s] 'whether there are outstanding issues that must be resolved before a determination of disability can be made, . . . . and whether further administrative proceedings would be useful.'" *Id*. (quoting *Treichler*, 775 F.3d at 1101). "When these first two conditions are satisfied, [the Court] then credit[s] the discredited testimony as true for the purpose of determining whether, on the record taken as a whole, there is no doubt as to disability." *Id*. (citing *Treichler*, 775 F.3d at 1101). Even when all three conditions are satisfied and the evidence in question is credited as true, it is within the district court's discretion whether to make a direct award of benefits or to remand for further proceedings when the record as a whole creates serious doubt as to disability. *Id*.. In rare instances, all three credit-as-true factors may be met, but the record as a whole still leaves doubts as to whether the claimant is actually disabled. *Trevizo*, 871 F.3d at 683 n.11. In such instances, remand for further development of the record is warranted. *Id*.

The Court has found that the ALJ failed to provide legally sufficient reasons for discounting the opinions of L.M.'s examining and treating medical sources, in favor of the opinions of the non-examining state agency consultants; discounting the opinions of L.M.'s other sources; and in discrediting L.M.'s symptom testimony. The Court further finds that there are no

outstanding issues to resolve.  The record in this case totals more than 1500 pages, contains

medical records from multiple providers spanning nearly a decade since L.M. applied for benefits,

as well as L.M.'s testimony from two administrative hearings.  As noted above, the Commissioner

has not identified any specific record or testimony needed to complete the record.  The Court finds

that the record does not need further development and that further administrative proceedings

would not be useful.

Crediting the discredited testimony as true, there is no doubt as to L.M.'s disability.  The

record establishes that L.M. satisfies, at minimum, listing 12.15 for trauma- and stressor-related

disorders due to her PTSD.  Several treating and examining providers over the years, including

Drs. Kalich, Bird, and Franklin, have diagnosed L.M. with PTSD and major depressive disorder.

*See, e.g.*, AR 507, 625, 635.  L.M.'s symptoms stemming from her chronic mental conditions are

documented throughout the record.  *See, e.g.*, AR 505-507, 560, 561, 565, 577, 588, 592-593, 616-

617, 625, 632-634, 641-642, 1067, 1092, 1098, 1106, 1156, 1220, 1226, 1245, 1246, 1254; *see

also* AR 721.  L.M. need only satisfy either a combination of the listing 12.15 paragraph A and B

criteria or the paragraph B and C criteria, and it is clear that L.M. satisfies at least the A and B

criteria.  Paragraph A of each listing includes medical indicia that must be present in a claimant's

medical evidence.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.A.2.a.  Paragraph B provides

functional criteria to evaluate how mental health conditions limit L.M.'s functioning, including the

ability to "[1] [u]nderstand, remember, or apply information; [2] interact with others;

[3] concentrate, persist, or maintain pace; and [4] adapt or manage oneself."  *Id.* § 12.00.A.2.b.  To

satisfy paragraph B, L.M.'s mental health condition "must result in 'extreme' limitation of one, or

'marked' limitation of two, of the four areas of mental functioning."  *Id.*  The trauma- and stressor-

related disorders within the scope of listing 12.15 are described as follows:

> These disorders are characterized by experiencing or witnessing a
> traumatic or stressful event, or learning of a traumatic event
> occurring to a close family member or close friend, and the
> psychological aftermath of clinically significant effects on
> functioning.  Symptoms and signs may include, but are not limited
> to, distressing memories, dreams, and flashbacks related to the
> trauma or stressor; avoidant behavior; diminished interest or
> participation in significant activities; persistent negative emotional
> states (for example, fear, anger) or persistent inability to experience

United States District Court
Northern District of California

positive emotions (for example, satisfaction, affection); anxiety; irritability; aggression; exaggerated startle response; difficulty concentrating; and sleep disturbance.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00.B.11.a.  As discussed above, the record contains ample evidence of these events and symptoms.  *See* AR 505-507, 560, 561, 565, 577, 588, 592-593, 616-617, 632-634, 641-642, 721, 1067, 1092, 1098, 1106, 1156, 1220, 1226, 1245, 1246, 1254.  With respect to paragraph B, consistent with the improperly discounted medical opinions and related evidence cited above, Dr. Bird/Ms. Jennings-Parriott and Dr. Franklin/Ms. Childs all assessed L.M. with extreme limitations in her ability to adapt.  *See* AR 627-628, 637.

While there is some variation in the treating and examining providers' assessed limitations of L.M.'s mental functioning, on the whole, all of these providers consistently opined that L.M. would have difficulty maintaining gainful employment due to her symptoms.  *See, e.g.,* AR 508 (Dr. Kalich:  "Due to her depressed mood, [L.M.] would have difficulty maintaining regular attendance at work"); AR 617 (Dr. Bird: "Given patient's severe and chronic psychiatric conditions that interfere with her ability to concentrate, motivate or handle stress, she is not expected to be able to maintain gainful employment."); AR 628 (Dr. Bird/Ms. Jennings-Parriott: L.M. would be absent from work four or more days per month and would be off-task more than 30% of an eight-hour day); AR 635 (Dr. Franklin/Ms. Childs:  noting "neuropsychological impairments that might be roadblocks to [L.M.'s] ability to maintain employment").

Additionally, when the improperly rejected evidence is credited, the ALJ would be required to find L.M. disabled at step five of the sequential analysis based on the VE's testimony.  *See, e.g., Garrison*, 759 F.3d at 1022; *Lingenfelter v. Astrue*, 504 F.3d 1028, 1041 (9th Cir. 2007); *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1401 (9th Cir. 1988).  As discussed above, Dr. Kalich opined that L.M. "would have difficulty maintaining regular attendance at work" (AR 508); Dr. Bird and Ms. Jennings-Parriott concluded that L.M. would miss four or more days of work per month and be off-task more than 30% of the time (AR 628); Dr. Franklin and Ms. Childs assessed L.M. with extreme limitations in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms (AR 637); and L.M. testified that she was out sick three to four days per month during her dishwashing work (AR

733).  At the May 2022 hearing, when the VE was asked whether there would be any possibility of employment for a person such as L.M., but with an allowance for that person to be off-task 15% of the workday, or unscheduled absences of three or four days per month, the VE responded in the negative.  AR 738-740.  The record contains no contrary evidence regarding the possibility of employment in these circumstances.

For all of the above reasons, the Court sees no basis for serious doubt in the record that L.M. is disabled.  Moreover, remand for benefits is appropriate, considering that L.M. first applied for benefits nearly ten years ago, this case has already been remanded once to the agency for further proceedings, and there is no indication that further proceedings would be useful.  *See Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) ("Allowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication.") (citation omitted).  The Court will remand for immediate calculation and payment of benefits.

## V.    CONCLUSION

Based on the foregoing, L.M.s motion for summary judgment is granted and the Commissioner's cross-motion for summary judgment is denied.  The Court remands this case for an immediate calculation and payment of benefits.  The Clerk shall enter judgment accordingly and close this file.

**IT IS SO ORDERED.**

Dated: September 27, 2023

VIRGINIA K. DEMARCHI
United States Magistrate Judge